COPY

1
BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
2
TIMOTHY J. TOOHEY (SBN 140117)
TToohey@GreenbergGlusker.com
3
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
4
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
5
Telephone: 310.553.3610
Fax: 310.553.0687
6

7
Attorneys for Plaintiffs
FIFTY-SIX HOPE ROAD MUSIC LIMITED, a
Bahamian corporation and
8
HOPE ROAD MERCHANDISING, LLC, a
Florida limited liability company
9

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

AUG 0 1 2016

Sherri H. Carter, Executive Office/Clerk
By: _____, Deputy
Ishayla Chambers

10
SUPERIOR COURT OF THE STATE OF CALIFORNIA

11
COUNTY OF LOS ANGELES

12
CENTRAL DISTRICT

13

BC 6 2 8 9 8 1

FAXED

14
FIFTY-SIX HOPE ROAD MUSIC
LIMITED, a Bahamian corporation, and
15
HOPE ROAD MERCHANDISING, LLC,
a Florida limited liability company
16

17
                    Plaintiffs,

18
        v.

19
JAMMIN JAVA CORPORATION, a
Nevada corporation, and DOES 1-10
20

        Defendants.

Case No.

**COMPLAINT FOR (1) BREACH OF
CONTRACT (LONG TERM LICENSE); (2)
BREACH OF CONTRACT (SHORT TERM
LICENSE); (3) DECLARATORY RELIEF
(LONG TERM LICENSE); (4)
DECLARATORY RELIEF (SHORT TERM
LICENSE); (5) INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE; (6) TRADEMARK
INFRINGEMENT; (7) ACCOUNTING; AND
(8) FRAUD-MISREPRESENTATION**

21

22

23

24

25

26

27

28

54742-00001/2658584.3

COMPLAINT

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

EXHIBIT A

**PRELIMINARY STATEMENT**

1.    Plaintiffs Fifty-Six Hope Road Music Limited ("56HR") and Hope Road Merchandising ("HRM") (collectively, 56HR and HRM are sometimes referred to herein as "Plaintiffs") bring this lawsuit to seek redress for defendant Jammin Java Corporation's ("Defendant" or "JJ") persistent pattern of ignoring and breaching its contractual obligations to Plaintiffs and engaging in a series of unlawful and unethical business practices with respect to Plaintiffs.  Plaintiffs are owned by the widow and children of the late reggae superstar Robert Nesta Marley (aka Bob Marley).

2.    From the early 1970s until his untimely death in 1981, Bob Marley was uniformly recognized as the most widely known and revered performer of reggae music.  In the years since his death, Bob Marley has become an international icon.  Plaintiffs are the successors in interest to all of the intellectual property and contract rights of Bob Marley, including without limitation the exclusive rights to the Bob Marley name, likeness and image.

3.    Pursuant to a written license agreement entered into in August 2012, Defendant licensed the right to use the Marley name for the sale of coffee beans.  Defendant has been behind in its royalty payments for over a year and has failed and been unable to pay the full amount of royalties owed to Plaintiffs, including some payments that have been delinquent for almost two (2) years.  To add insult to injury, while Defendant has failed and refused to pay the royalties owed, it fraudulently licensed Plaintiffs' own rights to unknowing third parties, leaving Plaintiffs to clean up the mess Defendant left behind.  Moreover, Defendant has engaged in a series of unlawful business practices, including some that resulted in violations of federal securities regulations requiring Defendant to enter into a consent decree with the Securities & Exchange Commission ("SEC") costing JJ hundreds of thousands of dollars and resulting in a public and formal judgment against the company for having engaged in serious violations of the securities laws.

4.    Through a combination of arrogance, incompetence and malfeasance, Defendant has been operationally challenged for a significant period of time.  During that time, it has sought

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  to leverage the Marley name and its purportedly "great" relationship with the owners of 56HR

2  and HRM to obtain credit with third parties, when in truth Defendants' relationship with the

3  owners of 56HR and HRM has been on shaky grounds for many months due in part to

4  Defendant's repeated material breaches of its contractual obligations.

5       5.    Despite  Plaintiffs' efforts to work with the company, Plaintiffs eventually had

6  enough and terminated their agreements with Defendant for the various material breaches of

7  contract and have instituted this action to recover damages caused by those breaches as well as

8  various tortious conduct by Defendant.  Additionally, Plaintiffs seek a declaration that the

9  pertinent agreements are terminated.

<u>**THE PARTIES**</u>

10       6.    Plaintiff  Fifty Six Hope Road Music Limited ("56HR") is a Bahamian

11  corporation with its principal place of business at Nassau, Bahamas.  56HR is the successor-in-

12  interest in and to all rights held by the late Robert Nesta Marley ("Bob Marley"), including all

13  name, image and likeness rights.  Plaintiff is owned by the widow and nine of the ten children of

14  Bob Marley.

15       7.    Plaintiff Hope Road Merchandising, LLC ("HRM") is a limited liability company

16  organized under the laws of the State of Florida with its principal place of business in Miami,

17  Florida.  HRM is likewise owned by the widow and nine of the ten children of Bob Marley.

18  HRM is a licensee of 56HR, and is the licensing and merchandising arm of the Marley family.

19       8.    On information and belief, Defendant Jammin' Java Corporation ("Defendant" or

20  "JJ") is a corporation organized under the laws of the State of Nevada with its principal place of

21  business in Denver, Colorado.  On further information and belief, JJ is a publicly traded company

22  (under the symbol "JAMN") that distributes coffee to U.S. and international retail channels, as

23  well as providing coffee to retail outlets, office coffee services, food services outlets and third

24  parties.

25       9.    On information and belief, Brent Toevs ("Toevs") is the Chief Executive Officer

26  and a director of JJ.

27

28

GREENBERG GLUSKER FIELDS CLAMAN<br>& MACHTINGER LLP<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067-4590

10.     On information and belief, Ahn Tran ("Tran") is the President, Chief Operating Officer, Secretary and Treasurer and a director of JJ.

11.     On information and belief, Rohan Marley ("Rohan") is a shareholder of Defendant JJ, and until recently was a member of its board of directors.  Rohan is a son of Bob Marley and is a non-managerial part owner of Plaintiffs.

12.     The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as Does 1 through 10, inclusive (collectively with JJ, "Defendants"), are unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Plaintiffs will amend this complaint to show their true names and capacities when the same has been ascertained.  Plaintiffs are informed and believe, and based thereon allege, that Does 1 through 10, inclusive, are responsible in some manner for the acts and transactions hereinafter alleged.

13.     Plaintiffs are informed and believe that in doing the acts alleged herein, each of the Defendants was the agent, principal, employee, aider and abettor, and/or co-conspirator of one or more of the other Defendants, and acted with the other Defendants' knowledge, consent and approval and/or within the course and scope of such agency, employment or conspiracy.  As such, each of the Defendants is responsible for the liabilities of the other Defendants, as alleged herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     Bob Marley was an undeniable superstar during his lifetime.  His fame, notoriety and popularity have only increased since his premature death from cancer in 1981 at the age of 36.  Today, Bob Marley is both an iconic figure of reggae music and an international legend.

15.     Bob Marley was a Jamaican singer, songwriter, performer and guitarist responsible for introducing the world to reggae music.  His best known hits are a veritable litany of classic songs:  "No Woman, No Cry," "One Love," "Redemption Song," and "Exodus."  Marley's posthumously released record album "Legend" is the biggest selling reggae album of all time, having sold more than 12 million records worldwide.  "One Love" was named song of the millennium by the BBC.  Marley was inducted into the Rock 'N Roll Hall of Fame in 1994.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Time Magazine chose Bob Marley's "Exodus" album as the greatest album of the 20th Century. In 2001 Marley was posthumously awarded the "Grammy Lifetime Achievement Award."

16.     Bob Marley was more than just a musician or singer-songwriter.  During his all too short life, he wrote music meant to bring people of all races and cultures together and he lived a life that sought peace and justice throughout the world.  In June 1978, he was awarded the Peace Medal of the Third World from the United Nations.  He was also a leader in his own country of Jamaica.  In February 1981, Bob Marley was awarded the Jamaican Order of Merit.

17.     56HR and HRM were established by Bob Marley's family and aim to follow in the footsteps of this great man.  Plaintiffs have spent substantial amounts of time, effort and money in licensing, enforcing, promoting, and, most importantly, protecting the Marley name and family of brands.  The idea for creating a brand of coffee based on Jamaican Blue Mountain beans and selling under the Marley name was the brain child of Rohan Marley.

18.     At all times relevant to this action, 56HR is and has been the worldwide owner of all intellectual property and publicity rights derived from Bob Marley and his musical legacy, including the rights to Bob Marley's name, image and likeness and hundreds of trademarks all around the world, including but not limited to:  "Marley Coffee," "Marley Coffee Stir It Up," "Bob Marley Coffee," and the Marley Coffee logo ("Marley Trademarks").

19.     56HR has registered the trademark "Bob Marley" with the United States Patent and Trademark Office under Registration Number 4,422,220 as a trademark for coffee, coffee beans, coffee-based beverages and other products.  56HR also has registrations with the United States Patent and Trademark Office for "Marley Coffee" for numerous goods and services under Registration Numbers 3,778,736, 3,871,574, 4,150,381, 4,158,045, 4,187,013, 4,254,177, and 4,328,523.  56HR on July 30, 2015 also filed a trademark registration for "Marley Coffee" for café and coffee house services under Serial Number 8670974 that was published for opposition on November 17, 2015.   56HR aggressively protects and enforces its rights worldwide in and to Bob Marley's name, image, likeness, trademarks and logos against any and all third parties who wrongfully seek to appropriate and/or misuse the same.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

20.     According to its website, www.marleycoffee.com, JJ is attempting "to achieve a leadership position by capitalizing on the global recognition of the 'Marley' brand name" and "to increase [its] sales through the marketing of products using the likeness of, and reflecting the personality of, Mr. Marley."

**August 7, 2012 Long Term License**

21.     On August 7, 2012, 56HR entered into a long term license agreement ("Long Term License") with JJ in which 56HR granted JJ the right to use the Marley Trademarks exclusively on coffee (i.e., coffee beans) and non-exclusively on coffee mugs, coffee glasses and other related products, as well as on coffee roasting, production and sales serves, excluding coffee houses (Long Term License Summary of Commercial Terms ("Summary") ¶¶ A-E; Long Term License ¶ 1).  The exclusive licensed products and non-exclusive licensed products are defined collectively as "Licensed Products."  (Summary ¶ D.)   The Long Term License also specified that JJ could provide "Licensed Services" in the form of "[c]offee roasting services, coffee production services, and coffees sales, supply, distribution and support services, excluding coffee houses."  (Id. ¶ E; emphasis added.)  The Long Term License clarified that JJ "may sell coffee to coffee houses, but may not open retail coffee houses under the licensed marks."  (Id. ¶ E; emphasis added.)

22.     The Long Term License further provided that the license was "non-transferable, non-assignable, non-sublicenseable, [and] non-divisible."  (Long Term License ¶ 1(a)).  The Long Term License had an initial term of fifteen (15) years and could be renewed for two additional fifteen (15) year terms so long as JJ was not in default of any material terms of the Long Term License.  (Summary ¶ H; Long Term License ¶ 2.)  The territory for the Long Term License was worldwide and was exclusive as to the Exclusive Licensed Products and the Licensed Services. (Summary ¶¶ I-J.)

23.     The Long Term License required that JJ pay to 56HR "Earned Royalties" of three percent (3%) of Net Sales within thirty (30) days following the completion of each calendar quarter of each calendar year.  (Summary ¶ K; Long Term License ¶ 3.)  Net Sales was defined as

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

the "invoiced billing price of all Licensed Products sold and shipped by Licensee [JJ] to its customers, excluding only federal and state taxes and shipping costs." (Summary ¶ K)

24.    Under the Long Term License JJ was required to "compute Earned Royalties [as specified in the Summary] . . . and [to] furnish to [56HR] within thirty (30) days following the end of each calendar quarter during the Term a complete and accurate statement . . . (each, a 'Quarterly Statement'), setting forth the number of Licensed Products sales made, the total gross revenue of Licensee relating thereto and the calculation of the amount of Earned Royalties due to Licensor for each such calendar quarter." (Long Term License ¶ 4(a).)  Moreover, JJ was obligated under the Long Term License to provide certified annual statements, quarterly "full and complete financial statements," and "annual audited financial statements" setting forth information required by 56HR, which includes sales information and calculation of royalties.  (Id. ¶¶ 4(b); 4(h).)

25.    Pursuant to Paragraph 15, the Long Term License provided 56HR the right to terminate the agreement on multiple grounds, including without limitation:

a.    "The failure of Licensee [JJ] to make any payment required to be made under this Agreement, which failure is not cured within ten (10) business days of Licensee's receipt of written notice from Licensor specifying the nature of such failure with particularity." (Long Term License ¶ 15(i).)

b.    "The breach by Licensee of any of its representations or warranties herein or the failure of Licensee to comply with any of the other terms of this Agreement or otherwise discharge its duties hereunder, and such breach or failure is not cured within fifteen (15) business days of Licensee's receipt of written notice from Licensor specifying the nature of such breach or failure with particularity." (Long Term License ¶ 15(ii).)

c.    "Any negative or unlawful finding of Licensee's or Jammin' Java's activities by the Securities & Exchange Commission or any similar government agency in any country, territory or possession." (Long Term License ¶ 15(v).)

26.     The Long Term License further provided that, if terminated "for any reason whatsoever, all rights in and to the Licensed Property shall revert to Licensor and Licensee shall have no further rights whatsoever with respect to the Licensed Products, the Licensed Property and/or any other intellectual property rights relating thereto." (Id. ¶ 16(a).)  Moreover, "[i]n no event shall any expiration or termination of this Agreement excuse any party from any breach or violation of this Agreement and full legal and equitable remedies shall remain available therefor, nor shall it excuse the making of any payment due under this Agreement with respect to any period prior to the date of expiration or termination." (Id. ¶ 16(c).)

27.     The Long Term License is governed by the laws of the State of California, requires that lawsuits be brought in courts in Los Angeles, California, and specifies that the parties have agreed to submit to personal jurisdiction of such courts. (Id. ¶ 20(e).)  Paragraph 16(c) of the Long Term License Agreement provides, *inter alia*, that section 4 (pertaining to required royalty payments and statements) and Section 20 (choice of law and venue) survive the termination of the agreement.

### **Breaches and Termination of Long Term License**

28.     <u>Failure to Provide Royalty Statements.</u>  Despite the contractual requirement that JJ provide royalty statements no later than thirty (30) days after the end of each quarter (Long Term License ¶4(a)), JJ only sent royalty statements to 56HR intermittently.  Regardless of being reminded and pressed to send the royalty statements more currently, the intermittent nature of the statements continued.  Beginning in or around July 2015, JJ ceased sending royalty statements to 56HR entirely.  Again, 56HR continued to press JJ to provide the required royalty statements, but its efforts were to no avail until on or about May 31, 2016 when JJ finally provided a summary Excel spreadsheet which showed that JJ owed 56HR $297,324.05 in accrued royalties that had been unpaid and accumulating for approximately the prior two (2) years.  The failure to provide royalty statements to 56HR was more than just unacceptable and a breach of the Long Term License, it made 56HR increasingly suspicious of the reasons it was not receiving the statements and disclosures to which it was entitled.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

29.     Additionally, despite the contractual requirement that JJ send 56HR certified Annual Statements (Long Term License ¶4(b)), quarterly full and complete financial statements (Long Term License ¶4(h)), and annual audited financial statements (Long Term License ¶4(h)), none of those statements have ever been provided to 56HR.  These breaches have continued to the present, in that JJ has failed and continues to fail to provide 56HR any of the statements and reports required by the Long Term License.

30.     Failure to Pay Royalties Owed.  Under the Long Term License, JJ had a grace period of one (1) year and eight (8) months before it was required to begin paying 56HR the royalties owed pursuant to that agreement ("Accrued Royalties").  (Long Term License, ¶4(c).)  In addition, JJ was permitted to repay the Accrued Royalties over the following year in equal quarterly installments.  (Id.)  Nevertheless, if JJ's May 31, 2016 royalty statement is accurate, beginning in approximately November 2014, JJ began falling behind on the royalty payments due to 56HR.  Beginning in approximately May 2015, the amount of royalties JJ owed to 56HR began to rise dramatically to amounts in excess of $100,000 because no payments were being made at all.  Two partial royalty payments were made by JJ at the end of 2015 and beginning of 2016, however, there was no accompanying royalty statement with those payments so 56HR was unaware of whether those payments made them whole, and if not, how much more was due.  JJ made repeated promises to pay the royalties owed to 56HR, but then failed to do so.  By approximately April 2016, the amount owed by JJ to 56HR had nearly tripled to $297,324.05, which amount remains unpaid to this day.

31.     JJ's Violations of SEC Regulations.  On information and belief, sometime in 2011 or 2012, JJ became a target of an investigation for securities violations in connection with a pump and dump scheme which the Securities and Exchange Commission ("SEC") believed provided approximately $2.4 million to JJ.  Because 56HR did not want to become entangled with any negative results of that investigation which did not at all involve it, 56HR insisted on inserting a provision in the Long Term License which would allow it to terminate the agreement upon "[a]ny negative or unlawful finding of . . . Jammin Java's activities by the Securities and Exchange

1    Commission or any similar government agency in any country, territory or possession." (Long

2    Term License ¶15(v).)

3        32.    On information and belief, in the months leading up to November 2015, JJ was

4    advised that the staff of the SEC had made a preliminary determination to recommend that the

5    Commission file a formal and public enforcement action against JJ for violations of §§5(a) and

6    5(c) of the Securities Act of 1933.  On further information and belief, instead of settling that

7    action outside of the public spotlight, JJ proceeded to litigate with the SEC.  Upon further

8    information and belief, the SEC staff did in fact recommend to the SEC that an enforcement

9    action be filed against JJ.  Upon further information and belief, the SEC agreed with its staff's

10   findings and, on or about November 17, 2015,  filed a formal complaint against JJ and others in

11   the United States District Court for the Central District of California, alleging a myriad of

12   securities violations ("SEC Action").

13       33.    56HR learned of the SEC Action shortly after its filing.  The complaint in the SEC

14   Action alleged that a former executive of JJ and his cohorts planned and executed a "pump and

15   dump" scheme involving JJ's stock that generated at least $78 million in illicit profits to the

16   perpetrators, approximately $2.4 million of which went into the pockets of JJ.  The complaint in

17   the SEC Action alleges claims against JJ and the other defendants, *inter alia*, for unregistered

18   offer and sales of securities, failure to file beneficial ownership reports, fraud in connection with

19   the purchase or sale of securities under Section 5 of the Securities Act of 1933, and touting

20   securities for compensation without disclosure.

21       34.    On or about April 27, 2016, 56HR learned that JJ, through Toevs, consented to the

22   entry of a final judgment against JJ in the SEC Action.  Under the final judgment, JJ consented to

23   be permanently restrained and enjoined from violating Section 5 of the Securities Act of 1933 and

24   to pay disgorgement in the amount of $700,000, consisting of $605,330.73 plus prejudgment

25   interest of $94,669.27.  Moreover, JJ agreed never to "take any action or make or permit to be

26   made any public statement denying, directly or indirectly, any allegation in the complaint or

27   creating the impression that the complaint is without factual basis."  (Consent Judgment, ¶10.)

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

35.     On the heels of the SEC Action, on or about December 28, 2015 certain JJ shareholders instituted a shareholder derivative action against JJ and its officers in the state of Nevada based largely on the same allegations contained in the SEC complaint.

36.     <u>Korean Coffee House License.</u>  Beginning in or about 2013, JJ had pursued 56HR to expand the current Long Term License to include the right to license the Marley Coffee brand for coffee houses.  While 56HR initially entertained the possibility, as time went on it began to emerge that JJ was having financial problems in connection with its coffee business.  Therefore, in or about May 2014, 56HR expressly told JJ it could not have a license for coffee houses and that it could not be out in the marketplace trying to license rights that belonged to 56HR.  In or about August 2014, 56HR learned that, despite the purported cessation of negotiations about coffee house rights and 56HR's express instruction that JJ stay out of the marketplace for coffee houses, JJ might have had some discussions with a Korean company, C&V International Co. Ltd. ("C&V") about the possibility of licensing the Marley Coffee brand to C&V for coffee houses in Korea in contravention to the Long Term License.  56HR confronted JJ with this information and JJ responded by assuring 56HR that JJ had not entered into any negotiations or agreements to license the rights to the Marley Coffee brand for coffee houses.  JJ professed that it was merely "vetting" C&V as a potential licensee for coffee houses so that it would not be passing on to 56HR any unqualified coffee house licensees.

37.     56HR reasonably relied on JJ's assurances that it would turn over potential licensees to be vetted by 56HR's own agents and that JJ had not had any negotiations for any non-product coffee license with any other third party.  To make matters perfectly clear, 56HR sent a letter to JJ on or about August 1, 2014 confirming the conversation and reiterating 56HR's policy that only 56HR and its official agent, CAA, could engage in any negotiations concerning the rights held by 56HR, and that JJ was not authorized to have any discussions on behalf of 56HR concerning the rights 56HR held.

38.     Notwithstanding this very clear warning and JJ's express assurances to the contrary, in or about March 2015, 56HR learned that JJ's assurances that it had not entered into

1  any negotiations or agreements to license the rights to the Marley Coffee brand for coffee houses

2  were false.

3      39.      Instead, on information and belief, sometime prior to March 2015, JJ (through

4  Tran) purported to execute a written license to C&V for the right to use the name Marley Coffee

5  on coffee houses in Korea and for ready to drink coffee beverages, in direct contravention of the

6  Long Term License, which provided that such licenses were outside the scope of JJ's rights.

7  56HR is also aware of subsequent attempts by JJ to negotiate other coffee house licenses with

8  third parties, in contravention of the restrictions of the Long Term License and the express

9  directions of 56HR.

10  **June 2, 2016 Notice of Breach**

11      40.      After learning on or about May 31, 2016 that, despite almost a year of nearly total

12  silence regarding the amount of royalties it owed 56HR, JJ in fact owed $297,324.05, 56HR

13  determined to send a formal notice of breach to JJ.  On June 2, 2016, 56HR, through counsel,

14  provided formal notice regarding the above material breaches of the Long Term License to JJ

15  ("June 2 Breach Notice").   The June 2, 2016 Breach Notice specifically referenced the breaches

16  set forth above in paragraphs 28 -35 above.

17      41.      In response to the June 2 Notice of Breach, Toevs sent an email to two of the

18  directors of 56HR essentially admitting that JJ did not have the money to pay 56HR the royalties

19  owed to it.  Instead Toevs stated that JJ "could try and make a substantial payment of the royalty

20  in the next couple of weeks if needed."

21      42.      JJ did not cure any of the above breaches (even the reporting breaches) within the

22  contractual cure period or in fact at all.  Therefore, on or about June 27, 2016, 56HR informed JJ

23  that it had terminated the Long Term License ("June 27 Termination Letter").

24      43.      On or about July 7, 2016, JJ admitted in an 8-K filing that 56HR had terminated

25  the Long Term License due to JJ's breach of various terms of the Long Term License.

26  **June 27, 2016 Short Term License**

27      44.      Because of Rohan's connection to JJ, a belief in the quality of the coffee itself and

28  JJ's statements that it had potential new investors interested in providing funding to JJ, 56HR

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

bent over backwards to give JJ another chance at proposing and demonstrating it could abide by a new and healthier relationship.  In order to make a good faith effort to evaluate whether there was any hope for a new Long Term License with JJ,  on June 27, 2016, at the same time as it terminated the Long Term License, 56HR offered JJ a short-term license agreement through its affiliate HRM on the condition, *inter alia*, that JJ execute a promissory note and security agreement securing the over $297,000 owed by JJ to 56HR for Earned Royalties.

45.     JJ agreed to execute the required promissory note and security agreement. Accordingly, on or about July 6, 2016, JJ and HRM entered into a short term license agreement, with an effective date of June 27, 2016 ("Short Term License").  For all intents and purposes, the June 27, 2016 Short Term License included the same material terms as the August 7, 2012 Long Term License as regards the scope of the licensed rights, the incurring and payment of Earned Royalties, quarterly, annual and financial statements, grounds for termination, effect of termination, and applicable law, venue and personal jurisdiction.  However, among other things, the parties to the Short Term License expressly acknowledged and agreed that the Short Term License replaced and superseded the Long Term License, which the parties agreed had been terminated.

46.     The Short Term License also differed from the Long Term License in that it had a six-month term, renewable for an additional six-month term at the discretion of HRM, and only on the condition that JJ was not in breach of the agreement.  *See* Short Term License Summary of Commercial Terms ¶¶ A, E.  The purpose of the Short Term License was to allow JJ to continue operating its coffee business while the parties explored whether there was a viable basis for entering into a new long term license.  The viability of a new long term license was in part dependent upon whether JJ genuinely had the ability to get its financial house in order, including making financial arrangements with potential lenders and distributors and, if so, under what terms and conditions.  A new long term license was also premised on JJ being able to demonstrate it could perform its obligations under any new agreement in a timely and professional manner (as 56HR expected all of its licensees to perform), and pay the Earned Royalties it already owed, and would owe in the future, in full and on a timely basis.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

47.     In addition to the same termination provisions that existed in the Long Term License, paragraph 15(a)(vi) of the Short Term License further provided that HRM could terminate the agreement if JJ was in breach "of any of its other agreements with Licensor or any of its affiliated companies. . . ."

48.     On June 27, 2016, JJ also entered into a Security Agreement securing its debt of $297,324.05 to 56HR, as well as a Secured Promissory Note for the debt.

49.     In furtherance of JJ's desire to demonstrate that it had the ability to get its financial house in order, it requested that Plaintiffs speak directly with one of its potential investors and one of its main creditors and distributors.  Plaintiffs agreed to have these conversations with these companies on the condition that the parties to the conversations could discuss anything without limit, and that nothing said during those conversations could be used for any purposes whatsoever, including without limitation any legal action.  JJ agreed to those conditions and executed a written agreement to that effect.  As a result, Plaintiffs did have conversations with both the potential investor and JJ's distributor/creditor during July 2016.

## **Breach of the June 27, 2016 Short Term License**

50.     In late June and early July, 2016, Plaintiffs worked in good faith with JJ and certain of its distributors and creditors to try to ascertain whether there was a viable basis on which a new long term license with JJ might be granted.  These efforts were unsuccessful.  JJ had failed to provide to Plaintiffs a concrete, realistic and viable short or long term plan for its financial survival.  Moreover, adding to their growing mistrust of and lack of confidence in JJ's management and demonstrating again JJ's lack of ethics in its business practices, Plaintiffs learned that despite the fact that JJ's potential investor had been conducting due diligence on JJ in connection with its potential investment since May 2016, JJ had deliberately failed to disclose the existence of the June 2 Breach Letter to the potential investor.  Moreover, JJ did nothing to cure any of its breaches of the Long Term License and was also in breach of the Short Term License.

51.     JJ breached the Short Term License, and/or the covenant of good faith and fair dealing, by the following, among other things:

a. The continued failure of JJ to provide certified statements as required by the Long Term License and Short Term License, and also because of JJ's continued failure to pay Earned Royalties under the agreements. (*See* Short Term License ¶¶ 3, 4(a), 4(b), 4(c) and 4(h); Summary ¶ H.)

b. Subsequent to the June 27 Termination Letter, Plaintiffs discovered UCC filings that purport to secure loans to JJ listing as security all of JJ's "general intangibles" which would include the Long Term and Short Term Licenses. This was surprising to 56HR because in or about December 2015, 56HR had discovered a prior UCC filing which purported to list JJ's "general intangibles" as security for a loan and 56HR objected to JJ in writing and reminded JJ about the non-assignability of the Long Term License. JJ responded that it understood 56HR's objection and would immediately rectify the situation. Therefore, it was astonishing to learn in or about July 2016 that the same lender had re-filed its UCC in January 2016 with the same exact language which once again purported to include the Long Term License. (*See* Short Term License ¶ 1(a) (license non-assignable); ¶ 15(a)(ii) (termination for failure to comply with terms of license); ¶ 20(c) ("licensee shall not assign or transfer this Agreement or any of its rights or obligations hereunder, directly or indirectly, by operation of law or otherwise, without the prior written consent of Licensor").)

c. During that same investigation in July 2016, Plaintiffs learned that several other of JJ's lenders similarly had completed UCC filings on the same basis, securing all of JJ's "general intangibles," which would include the Long Term and Short Term Licenses. (*See* Short Term License ¶ 1(a) (license non-assignable); ¶ 15(a)(ii) (termination for failure to comply with terms of license); ¶ 20(c) ("licensee shall not assign or transfer this Agreement or any of its rights or obligations hereunder, directly or indirectly, by operation of law or otherwise, without the prior written consent of Licensor").)

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

d.  Plaintiffs discovered in or about July 2016 that JJ had entered into unpermitted sublicenses.  (*See* Short Term License ¶ 1(a) (license non-sublicensable and non-divisible); ¶ 15(a)(ii) (termination for failure to comply with terms of license); ¶ 20(c) ("licensee shall not assign or transfer this Agreement or any of its rights or obligations hereunder, directly or indirectly, by operation of law or otherwise, without the prior written consent of Licensor").)

e.  JJ is unable to pay current debts as they come due and/or continue its current business activities, even in the short term.  Indeed, JJ is no longer filling all of the purchase orders from customers, putting the Marley Coffee brand in grave danger.  (*See* Short Term License ¶ 10(b)(iv) (JJ represents that it "will conduct the advertising, promotion and sale of Licensed Products in a manner commensurate with the promotion and sale of high quality merchandise and in a manner in keeping with the philosophy of Licensor as expressed to Licensee"); ¶ 10(b)(vii) ("Licensee will conduct its business in a manner that reflects favorably at all times on the Licensed Products and on Licensor's goodwill and reputation"); ¶ 15(a)(ii) (termination for breach of warranties); ¶ 15 (a)(iv) (termination for cessation of operations).)

f.  JJ has ceased advertising, promoting and selling Marley Coffee in a manner commensurate with the promotion and sale of high quality merchandise.  (*See* Short Term License ¶ 10(b)(iv) (JJ represents that it "will conduct the advertising, promotion and sale of Licensed Products in a manner commensurate with the promotion and sale of high quality merchandise and in a manner in keeping with the philosophy of Licensor as expressed to Licensee"); ¶ 10(b)(vii) ("Licensee will conduct its business in a manner that reflects favorably at all times on the Licensed Products and on Licensor's goodwill and reputation"); ¶ 15(a)(ii) (termination for breach of warranties); ¶ 15 (a)(iv) (termination for cessation of operations).)

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

g. JJ has continued to engage ineffective management and directors who are unwilling or unable to effectively manage JJ and have committed multiple breaches of the agreements.  Most alarmingly, on information and belief, JJ has filed false and misleading 10K statements.  For example, on information and belief, Toevs has a one-third (33.3%), ownership interest in National Coffee Servicing & Vending ("NCS&V"), a distributor for JJ.  In its 10-K statements, however, JJ described Toevs as having concluded his relationship with NCS&V in 2011, prior to joining JJ.  Toevs' blatant undisclosed conflict of interest is not only yet another violation of SEC regulations, but it constitutes a breach of the implied covenant of good faith and fair dealing.  (*See* Short Term License ¶ 10(b)(vii) ("Licensee will conduct its business in a manner that reflects favorably at all times on the Licensed Products and on Licensor's goodwill and reputation"); ¶ 10(b)(x) (JJ "will avoid deceptive, misleading or unethical business practices. . . .").)

52.    Accordingly, on July 21, 2016, HRM, through counsel, informed JJ that it was terminating the June 27, 2016 Short Term License effective that date ("July 21 Termination Letter") based on the breaches outlined above.

### Disputes Regarding Termination of Agreements

53.    Between July 21, 2016, when HRM terminated the June 27, 2016 Short Term License, and the present, a dispute has arisen between Plaintiffs, on the one hand, and Defendant JJ, on the other hand, as to whether the Long Term License and the Short Term License remain in force in effect.  JJ, through Toevs, Tran and counsel, continue to insist, despite the clear and unambiguous notices and agreements to the contrary, and express admissions and representations made in public securities filings, that both of these agreements are still in effect.   On the other hand, 56HR and HRM maintain that the Long Term License and the Short Term License are both terminated.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## FIRST CAUSE OF ACTION

**(Damages for Breach of Contract Against Defendant JJ – Long Term License)**

54.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

55.     Plaintiffs have done everything on their part to be done by them under the Long Term License and are in no manner or respect in breach thereof.

56.     JJ has materially breached the terms of the Long Term License as follows, among other things:

   a.     JJ failed to provide royalty statements after the end of each quarter as required by ¶ 4(a) of the Long Term License;

   b.     JJ has not provided certified annual statements, quarterly financial statements; and annual audited financial statements as required by ¶¶ 4(b) and 4(h) of the Long Term License;

   c.     JJ has not paid 56HR all royalties owed under Summary ¶ K and ¶¶ 3-4 of the Long Term License and, according to its own tardy royalty statement, currently owes 56HR at least $297,324.05;

   d.     JJ has violated SEC Regulations and consented to a final judgment against JJ in the SEC Action in contravention of ¶ 15(v) of the Long Term License;

   e.     JJ purported to execute a written license to C&V for the right to use the name Marley Coffee on coffee houses in Korea and for ready to drink coffee beverages, and has attempted to negotiate other coffee house licenses with third parties in contravention of ¶¶ 1(a) and 20(c) of the Long Term License;

   f.     JJ has made assignments, transfers to creditors, or security agreements to creditors in contravention of ¶¶ 1(a), 15(a)(ii) and 20(c) of the agreement;

   g.     JJ has made unpermitted sublicenses in contravention of ¶¶ 1(a), 15(a)(ii) and 20(c) of the agreement.

57.     JJ has breached the implied covenant of good faith and fair dealing inherent in the Long Term License by engaging in conduct as set forth above.

54742-00001/2658584.3

17

58.     JJ has caused substantial damage to Plaintiffs in an amount not yet fully ascertained, but which will be the subject of proof at trial.

## SECOND CAUSE OF ACTION

### (Damages for Breach of Contract Against Defendant JJ – Short Term License)

59.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

60.     Plaintiffs have done everything on their part to be done by them under the Short Term License and are in no manner or respect in breach thereof.

61.     In addition to its failure to cure its breaches of the Long Term License as set forth in paragraph 56 above, JJ has materially breached the Short Term License as follows, among other things:

a.     JJ has continued to fail to provide the certified quarterly statements required by ¶ 4(a) of the Short Term License;

b.     JJ has continued to fail to pay royalties owed under Summary ¶ H and ¶¶ 3-4 of the agreement;

c.     JJ has made assignments, transfers to creditors, or security agreements to creditors in contravention of ¶¶ 1(a), 15(a)(ii) and 20(c) of the agreement;

d.     JJ has made unpermitted sublicenses in contravention of ¶¶ 1(a), 15(a)(ii) and 20(c) of the agreement;

e.     JJ has failed to pay current debts as they come due and to continue its business activities in contravention of ¶¶ 10(b)(iv), 10(b)(vii), 15(a)(ii) and 15(a)(iv) of the agreement;

f.     JJ has ceased advertising, promoting and selling Marley Coffee in a manner commensurate with the promotion and sale of high quality merchandise in contravention of ¶¶ 10(b)(iv), 10(b)(vii), 15(a)(ii), and 15(a)(iv) of the agreement;

g.     JJ has continued to engage management and directors who have ineffectively managed JJ and have blatant undisclosed conflicts of interest in contravention of ¶¶ 10(b)(vii), 10(b)(x), 15(a)(ii) and 15(a)(v) of the agreement.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

62.     JJ has breached the implied covenant of good faith and fair dealing inherent in the Short Term License by engaging in conduct as set forth above.

63.     JJ has caused substantial damage to Plaintiffs in an amount not yet fully ascertained, but which will be the subject of proof at trial.

### THIRD CAUSE OF ACTION

### (Declaratory Relief Against Defendant JJ – Long Term License)

64.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

65.     By reason of the foregoing facts, an actual and present controversy has arisen between the parties as to whether Plaintiffs have effectively terminated the Long Term License and all provisions thereof, or whether the agreement instead remains in full force and effect.

66.     A declaration by the Court is necessary so that the parties can know their respective rights and obligations.  In particular, Plaintiffs request a declaration that the Long Term License has been terminated, except as to those provisions that survive termination, including without limitation the obligation of JJ to pay royalties to 56HR.

### FOURTH CAUSE OF ACTION

### (Declaratory Relief Against Defendant JJ – Short Term License)

67.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

68.     By reason of the foregoing facts, an actual and present controversy has arisen between the parties as to whether Plaintiffs have effectively terminated the Short Term License and all provisions thereof, or whether the agreement instead remains in full force and effect.

69.     A declaration by the Court is necessary so that the parties can know their respective rights and obligations.  In particular, Plaintiffs request a declaration the Short Term License has been terminated, except as to those provision that survive termination, including without limitation the obligation of JJ to pay royalties to HRM.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

### FIFTH CAUSE OF ACTION

### (Interference with Prospective Economic Advantage Against All Defendants)

70.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

71.     The conduct of Defendants, as described above, including entering into an agreement with C&V in Korea and entering into other licenses or sublicenses, was designed to disrupt the economic relationships between Plaintiffs and their prospective customers, including licensees, and such relationships were disrupted as a result of Defendants' interference.

72.     As a proximate result of Defendants' conduct, Plaintiffs have suffered damages for lost profits in an amount to be proven at trial.

73.     The conduct of Defendants in interfering with Plaintiffs' economic relationship was intentional, willful, and calculated to cause damage to Plaintiffs.  The conduct of Defendants, and each of them, was perpetrated with actual malice and ill will toward Plaintiffs, and with the intentional and improper purpose of causing damage, thereby justifying an award of punitive and exemplary damages.

74.     Defendants' aforementioned wrongful conduct was designed to disrupt, and has in fact disrupted, as well as adversely affected, Plaintiffs' economic relationship with licensees and prospective licensees of Plaintiffs' trademarks and other intellectual property.  As a result of Defendants' conduct, Plaintiffs have lost valuable prospective economic relations.

### SIXTH CAUSE OF ACTION

### (Trademark Infringement Against JJ)

75.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

76.     At all times relevant hereto, 56HR has been the sole owner of all right, title, and interest in and to the federally registered Marley Trademarks, including trademarks in "Bob Marley" under United States Patent and Trademark Office Registration Number 4,422,220 and "Marley Coffee" for numerous goods and services under United States Patent and Trademark

Office Registration Numbers 3,778,736, 3,871,574, 4,150,381, 4,158,045, 4,187,013, 4,254,177, and 4,328,523

77.     56HR is well known throughout the United States and elsewhere for goods branded by the famous Marley Trademarks, including coffee and coffee-related products that are distributed and sold to consumers throughout the United States and elsewhere.

78.     By virtue of its advertising and sales efforts, together with consumer acceptance and recognition, 56HR's Marley Trademarks distinguish products bearing those trademarks from similar products manufactured and sold by others.  56HR's Marley Trademarks are a valuable asset symbolizing high quality products and embodying substantial goodwill.

79.     Plaintiffs 56HR and HRM seek to enjoin, and obtain damages resulting from, Defendant's unauthorized manufacture, use, sale, offer to sell, distribution, licensing and/or import for subsequent use, sale and distribution of products that infringe on the Marley Trademarks.

80.     Because of the termination of the Long Term License and Short Term License, Defendant no longer has any rights to manufacture, use, sell, offer to sell, distribute, license and/or import for subsequent use, sale and distribution any products bearing the Marley Trademarks.  Indeed, ¶ 16(a) of the Long Term License and the Short Term License provides that if the agreements are terminated "for any reason whatsoever, all rights in and to the Licensed Property shall revert to Licensor and Licensee shall have no further rights whatsoever with respect to the Licensed Products, the Licensed Property and/or any other intellectual property rights relating thereto."

81.     Nonetheless, without authorization from Plaintiffs, Defendant continues to manufacture, use, sell, offer to sell, distribute, license, offer to license and/or import for subsequent use, sale and distribution products bearing the Marley Trademarks, including coffee and coffee-related products.

82.     Plaintiffs have informed JJ that the Long Term License and the Short Term License are terminated and that JJ's rights under those agreements are also terminated, including its rights to manufacture, sell and distribute coffee and coffee-related products with the Marley

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Trademarks. Nonetheless, JJ continues to willfully manufacture, distribute and sell products bearing the Marley Trademarks.

83. JJ's use of the Marley Trademarks is likely to cause public confusion, to cause mistake or deceive in that the public will believe that the products manufactured, distributed or sold by JJ are authorized by Plaintiffs.

84. Defendant's infringement of the Marley Trademarks is willful and is undertaken with full knowledge and in conscious disregard of the rights of Plaintiffs and with intent to trade off their good will in the Marley Trademarks.

85. Defendant's conduct, unless enjoined, will cause great and irreparable injury to Plaintiffs, for which they will not, and do not, have an adequate remedy at law.

86. The aforesaid circumstances render this an exceptional case that entitles 56 Plaintiffs to attorneys' fees under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

87. The aforesaid circumstances entitle Plaintiffs to statutory damages as provided for under 15 U.S.C. § 1117(c).

88. By virtue of the aforementioned acts, JJ has violated Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)) related to counterfeit products.

## SEVENTH CAUSE OF ACTION

### (Accounting Against Defendant JJ)

89. Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

90. Pursuant to the Long Term License and the Short Term License, JJ is liable to Plaintiffs, among other things, for payment of the royalties for sales of Licensed Products and Licensed Services.

91. Pursuant to the Long Term License and Short Term License, JJ also has an obligation to provide quarterly and other financial reporting statements to Plaintiffs that provide a basis for calculating and verifying such royalties.

92. JJ has not provided Plaintiffs with the statements required under the Long Term License and Short Term License, nor has it accounted for its sales to Plaintiffs under either

54742-00001/2658584.3

22

agreement in a manner that would allow Plaintiffs to verify the royalties owed under the respective agreements.

93.     An accounting to Plaintiffs regarding JJ's sales of licensed products is necessary for Plaintiffs to calculate and verify the royalties to which they are entitled under the Long Term License and Short Term License.

94.     A dispute exists between Plaintiffs, on the one hand, and Defendant JJ, on the other hand, as to how much money JJ owes to Plaintiffs for unpaid royalties under the Long Term License and the Short Term License.  Because of the mismanagement by JJ and its officers and directors, as well as fraud as alleged herein, Plaintiffs further allege that JJ's accounts are complicated and an accounting is required to understand the true state of JJ's financial affairs.

95.     Plaintiffs therefore request the Court to order an accounting of JJ's books and records, including but not limited to, books and records relating to JJ's sales of Licensed Products and Licensed Services.

## EIGHTH CAUSE OF ACTION

### (Fraud—Misrepresentation Against All Defendants)

96.     Plaintiffs incorporate by reference paragraphs 1 through 53 hereinabove as though fully set forth herein.

97.     Beginning in or about 2013, Defendants asked 56HR to expand the scope of the Long Term License to include the right to license the Marley Coffee brand for coffee houses. While 56HR initially entertained the possibility, as time went on it began to emerge that JJ was having financial problems in connection with its coffee business.  Therefore, in or about May 2014, 56HR refused to expand the scope of the license and so informed Defendants.

98.     In or about August 2014, Plaintiffs discovered that, despite its purported cessation of negotiations about coffee house rights, Defendants had continued to have discussions with a Korean company called C&V International Co. Ltd ("C&V").

99.     Consequently, in or about August 2014, Plaintiffs, through counsel, again informed representatives of Defendants, including Tran and Toevs, that Defendants were not allowed to discuss a potential license with C&V regarding opening coffee houses in Korea.  At or

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

about the same time, Plaintiffs also told Defendants that they were to turn over any further

negotiations to Plaintiffs' agents, Creative Artists Agency (CAA).  In response, Defendants

through Tran and Toevs insisted that Defendants were only "vetting" the potential licensee and

was not making a licensing deal with any third party.

100.    Defendants' statements were false.  Unbeknownst to plaintiffs, and on information

and belief, Defendants had been negotiating a license for the Marley Trademarks with C&V since

in or about April 2014 and such negotiations continued without interruption.  Moreover,

Defendants did not cease its negotiations with C&V and continued discussions with that entity

throughout 2014 and into 2015, and in fact reached a deal with C&V which was at some point in

time reduced to writing and executed by Defendants and C&V.

101.    Defendants made the above false misrepresentations to Plaintiffs to induce them to

rely upon its statements and to attempt to consummate a deal with C&V before Plaintiffs could

prevent them from doing so.  Plaintiffs justifiably and reasonably relied upon Defendants' false

statements and misrepresentations.

102.    In or about March 2015, Plaintiffs learned that Defendants had in fact entered into

an agreement with C&V on terms that were unfavorable to the licensor.  When Plaintiffs learned

of the existence of a written agreement and contacted C&V to inform C&V that it had made a

deal with the wrong party, but that Plaintiffs were willing to negotiate a similar deal with C&V,

C&V informed Plaintiffs that it would not deviate from the deal terms it already had with

Defendants.  Thus, Plaintiffs were damaged by Defendants' actions, in that the unlawful licensing

deal which Defendants reached with C&V contained terms that were not favorable to the licensor,

but that Plaintiffs were forced to adopt in order to avoid litigation with C&V.  Plaintiffs, in effect,

were stuck with a deal that was less favorable to them, including as to royalty terms, than the one

they would have negotiated for themselves if Defendants had not misrepresented their dealings

with C&V.

103.    Defendants' aforementioned wrongful conduct was designed to disrupt, and has in

fact disrupted, as well as adversely affected, Plaintiffs' economic relationships with licensees and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

prospective licensees of Plaintiffs' trademarks and other intellectual property. As a proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

104.    The conduct of Defendants in misrepresenting the true facts relating to their dealings with C&V was intentional, willful, and calculated to cause damage to Plaintiffs. The conduct of Defendants, and each of them, was perpetrated with actual malice and ill will toward Plaintiffs, and with the intentional and improper purpose of causing damage, thereby justifying an award of punitive and exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment as follows:

1.      As to the First Cause of Action for Breach of Contract (Long Term License):

    a.      For damages that shall be proved at trial.

2.      As to the Second Cause of Action for Breach of Contract (Short Term License):

    a.      For damages that shall be proved at trial.

3.      As to the Third Cause of Action for Declaratory Relief (Long Term License):

    a.      That the Court declare the Long Term License and all provisions thereof have been terminated for JJ's material breach, except as to terms that survive termination.

4.      As to the Fourth Cause of Action for Declaratory Relief (Short Term License):

    a.      That the Court declare the Short Term License and all provisions thereof have been terminated for JJ's material breach, except as to terms that survive termination.

5.      As to the Fifth Cause of Action for Interference with Economic Advantage:

    a.      For compensatory damages to be proven at trial; and

    b.      For exemplary damages in such amount as is found proper.

6.      As to the Sixth Cause of Action for Trademark Infringement:

    a.      For injunctive relief against JJ enjoining and restraining it from continuing to use, infringe and exploit the Marley Trademarks;

    b.      For a declaration that JJ has no interest in the Marley Trademarks;

    c.      For a judgment and decree that JJ has infringed and continues to infringe the Marley Trademarks belonging to Plaintiffs;

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

d.      That this Court order an accounting of JJ's profits resulting from their acts of trademark infringement;

e.      That the Court award Plaintiffs remedies for trademark counterfeiting under 15 U.S.C. § 1117(b) and (c), including mandatory treble damages and attorneys' fees, and applicable statutory damages;

f.      That the Court order and award to Plaintiffs up to three times the amount of compensatory damages because of JJ's willful trademark infringement, and any enhanced damages provided by statute; and

g.      For Plaintiffs' reasonable attorneys' fees, including any attorneys' fees allowable under the Lanham Act;

7.      As to the <u>Seventh Cause of Action for Accounting</u>:

a.      For an accounting under the Long Term License and the Short Term License.

8.      As to the <u>Eighth Cause of Action for Fraud-Misrepresentation</u>:

a.      For compensatory damages to be proven at trial; and

b.      For exemplary damages in such amount as is found proper.

9.      As to <u>All Causes of Action</u>:

a.      For such other and further relief as the Court deems proper;

///
///
///
///
///
///
///
///
///
///

54742-00001/2658584.3

26

1     b.  For general and specific damages against Defendants in an amount to be

2 determined at trial; and

3     c.  For Plaintiffs' reasonable attorney's fees and costs of suit incurred herein.

4

5

6 DATED:  August 1, 2016     GREENBERG GLUSKER FIELDS CLAMAN
             & MACHTINGER LLP

7

8           By: *Bonnie E. Eskenazi*

9            BONNIE E. ESKENAZI
            TIMOTHY J. TOOHEY

10           Attorneys for Plaintiffs FIFTY-SIX HOPE
            ROAD MUSIC LIMITED, a Bahamian

11           limited liability company, and HOPE ROAD
            MERCHANDISING, LLC, a Florida limited

12           liability company

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590